**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **CENTRAL MFG. CO., STEALTH INDUSTRIES, INC., and LEO STOLLER** | ) ) ) | |
| **Plaintiffs,** | ) ) | |
| | ) | **No. 04 C 3049** |
| **v.** | ) | |
| **GEORGE BRETT & BRETT BROTHERS SPORTS INTERNATIONAL, INC.** | ) ) | **HONORABLE DAVID H. COAR** |
| | ) ) | |
| **Defendants.** | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Before this Court are the parties' cross-motions for summary judgment on Plaintiffs' claims of trademark violation, request for preliminary and permanent injunctions against Defendant, 15 U.S.C. § 1116, Lanham Act violations, 15 U.S.C. § 1125(a), and Illinois Deceptive Trade Practices Act, 815 ILCS 510/1 *et seq*. For the reasons set forth below, Plaintiffs' motion for summary judgment is denied; and Defendant's motion for summary judgment is granted. This Court hereby cancels Plaintiffs' '249 Registration.

**I.     BACKGROUND**

Plaintiff Leo Stoller and his stable of corporate entities are no strangers to the legal system and are particularly familiar with the courts in this district. Indeed, as several judges (including this one) have previously noted, Stoller appears to be running an industry that produces often spurious, vexatious, and harassing federal litigation. *See, e.g., S Indus., Inc. v. Stone Age Equip., Inc.*, 49 U.S.P.Q. 2d 1071 (N.D. Ill. 1998) (Castillo, J.) (Stoller spawned

"litigation lacking in merit and approaching harassment"); *S Indus., Inc. v. Hobbico*, 940 F. Supp. 210, 211 (N.D. Ill. 1996) (Shadur, J.) (Stoller "appears to have entered into a new industry–that of instituting federal litigation").  Unlike a public corporation, which would be accountable to its shareholders, Stoller's corporate entities appear impervious to Stoller's repeated losses in federal courts in this district and beyond. A search of the court filing system discloses that Plaintiff and one or more of his corporate entities have been involved in at least 49 cases in this district alone.[1] Of these, at least 47 purport to involve trademark infringement. At least 13 of these cases have been reported in online legal databases such as LEXIS and Westlaw. No court has ever found infringement of any trademark allegedly held by Stoller or his related companies in any reported opinion. In fact, courts in this district have ordered Stoller or his corporate entities to pay defendants' attorneys' fees and costs in at least six reported cases. *S Indus., Inc. v. Ecolab Inc.*, 1999 WL 162785 (N.D. Ill. Mar. 16, 1999) (Gottschall, J.); *S Indus., Inc. v. Stone Age Equip., Inc.*, 12 F. Supp. 2d 796, 798-99, 819-20 (N.D. Ill. 1998) (Castillo, J.); *S Indus., Inc. v. Centra 2000, Inc.*, 1998 WL 157067 (N.D. Ill. Mar. 31, 1998) (Lindberg, J.), *aff'd by* 249 F.3d 625, 627-29 (7th Cir. 2001); *S Indus., Inc. v. Diamond Multimedia Sys., Inc.*, 991 F. Supp. 1012 (N.D. Ill. 1998) (Andersen, J.); *S Indus., Inc. v. Diamond Multimedia Sys., Inc.*, 17 F. Supp. 2d 775 (N.D. Ill. 1998) (Andersen, J.); *S Indus., Inc. v. Diamond Multimedia Sys., Inc.*, 1998 U.S. Dist. LEXIS 14470 (N.D. Ill. Sept. 10, 1998) (Andersen, J.); *S Indus., Inc. v. Kimberly-Clark Corp.*, 1996 U.S. Dist. LEXIS 9567, at *3-*4 (N.D. Ill. July 1, 1996) (Shadur, J.); *S Indus., Inc. v. Hobbico, Inc.*, 940 F. Supp. 210, 212 (N.D. Ill. 1996) (Shadur, J.). The present case bears all the hallmarks of a typical Leo Stoller trademark infringement suit.

---

[1] See Appendix I at the end of this opinion.

Stoller's trademark infringement lawsuits typically arise in the following way. An entity markets a product that bears some version of the name "Stealth" or has a description pertaining to "stealth"-like qualities. Plaintiffs send what Stoller deems a cease-and-desist letter to the alleged infringer, along with an offer to "license" the "Stealth" mark. If the alleged infringer refuses to agree to Plaintiffs' license demands or to cease using "Stealth," then Plaintiffs bring a trademark infringement suit.

The sheer number of cases Plaintiffs have filed in this district raise serious questions about Plaintiffs' and Plaintiffs' counsel's good faith. In fact, several courts in this district have noted explicitly that Plaintiffs deal in meritless claims and bad faith litigation. *See, e.g, Stone Age Equip.*, 12 F. Supp. at 798.

**Defendants**

Plaintiffs' present dispute is with Brett Bros. Sports International, Inc. and George Brett (collectively "Brett Bros."). Brett Bros. is a Washington corporation with its principal place of business in Spokane, Washington. George Brett, a 1999 Baseball Hall of Fame inductee, has been president of the corporation since June 2001. Since 1997, Brett Bros.[2] has been manufacturing and selling baseballs, baseball bats, baseball gloves, and other baseball related

---

[2] Brett Bros. was started in April 1997 as Tridiamond Sports, Inc., by Joe Sample and several other individuals. Tridiamond began manufacturing and selling three models of wooden baseball bats, the Mirador, the Stealth, and the Bomber. Tridiamond formed a relationship with former Major League baseball player and Baseball Hall of Fame inductee George Brett, and his brothers Ken, John, and Robert Brett, all of whom have played baseball professionally. The Brett brothers purchased a 50% interest in Tridiamond, after which the company changed its name to Brett Brothers Bat Company. Subsequently, in recognition of the fact that company had expanded to a full line of baseball-related products and had customers around the world, the company changed its name again, to Brett Brothers Sports International, Inc. George Brett is currently the president of Brett Bros., and Joe Sample and Robert Brett are the vice-presidents.

accessories throughout North America and overseas. Specifically, Brett Bros. manufactures and sells eight different models of wooden baseball bats that are used from Little League Baseball to Major League Baseball and at all levels in between. One of the Brett Bros. most popular bat models is the Stealth baseball bat. Both the Little League Baseball Association and the National Collegiate Athletic Association have recognized the Brett Bros.' Stealth bat as approved equipment. Brett Bros. currently sells its bats, including the Stealth model bat, through retail outlets and directly to consumers over the internet. Brett Bros. registered the domain name <http://www.brettbats.com> on May 14, 1999, and hosts a website at that domain to advertise and sell its baseball related products, including the Stealth bat. (Def.'s L.R. 56.1(a), Ex. D).

Brett Bros.' first documented sale of its Stealth bat occurred on July 13, 1999, when it sold twelve Stealth bats to Tim Nolan of Pro-Cut in Rockford, Illinois. (Def.'s L.R. 56.1(a), Ex. D; Ex. H). Since 1999, Brett Bros. asserts that it has sold over 25,000 Stealth bats to vendors, distributors, the NCAA, educational institutions, and private individuals through its website, and phone, fax, tradeshow, and third-party sales. (Def.'s L.R. 56.1(a), Ex. D).

**Plaintiffs**

Plaintiff Central Manufacturing, Inc. (which also does business as Central Manufacturing Co.) is a Delaware corporation with its principal place of business in Chicago, Illinois. Plaintiff Stealth Industries, Inc. is also a Delaware corporation with its principal place of business in Chicago. Plaintiff Leo D. Stoller is the president and sole shareholder of both Central Manufacturing and Stealth Industries, in addition to several other corporate entities including S Industries, Inc., and Sentra Manufacturing. Central is also the owner of Rentamark.com, a service mark used as a licensing agency through which Plaintiffs enter licensing agreements with

third-party entities or corporations for use of their marks on a wide array of products. Plaintiffs

assert that Central Manufacturing Company has become the registrant and/or assignee of "33

federally registered Stealth or Stealth formative marks." (Pls.' Summ. J. Br., at 2.) In their

summary judgment brief, Plaintiffs contend that "Plaintiffs' use of the mark STEALTH as a

trade name, 'house' mark, and service mark began in 1981 and has continued until the present."

(Pls.' Summ. J. Br., at 6.) In addition, they provide 51 alleged licensing or settlement agreements

between one of Leo Stoller's companies and a third-party for use of the word "Stealth" on

products ranging from hand tools to make prosthetic limbs to construction consulting services to

track lighting.

**Present Dispute**

      In their Amended Complaint, Plaintiffs assert that they are "engaged in the business of

marketing, promoting, licensing and selling in interstate commerce a broad range of goods...."

(Am. Compl., ¶ 7). In addition, Plaintiffs allege that they have been using the word "Stealth" as a

trade name and trademark to identify their products and businesses continuously since at least

1982. (Am. Compl. ¶ 8). On October 5, 2004, pursuant to Rule 34 of the Federal Rules of Civil

Procedure, Brett Bros. issued document production requests to Plaintiffs, requiring them to

produce "any and all documents showing the volume of sales for goods (including, but not

limited to baseball bats, baseballs, or any other sports equipment) bearing Plaintiffs' alleged

mark 'Stealth'." Plaintiffs failed to respond. On January 4, 2005, this Court entered an order

requiring Plaintiffs to comply with all outstanding discovery requests by January 25, 2005.

Plaintiffs again failed to comply and did not produce any documents by the deadline. Plaintiff

Leo Stoller appeared for his deposition on February 8, 2005, and stated that he possessed

invoices for baseball bats, but failed to produce any of those documents then or subsequently. Instead, he produced a softball and a piece of paper he alleged was an advertising flyer for a "Stealth baseball." (Stoller Dep., at 34-35). Stoller testified at his deposition that he has sold baseball bats to Montgomery Wards, Venture, Lucky Jemco, Zayre's, Ames, Service Merchandise, Best Products, Sports Mart, Brown's Sporting Goods, Walmart and Sears stores. Further, he stated that he has invoices for baseball bats from these alleged customers, but did not produce them at his deposition or at any other time. In addition, he alleged he has purchase orders from other customers for "Stealth" baseball bats; he has not produced those purchase orders either at any point in this litigation.

On February 11, 2005, Stoller provided Brett Bros.' counsel with documents he characterized as "sales records," purporting to show that Plaintiffs actually sold baseball bats bearing the mark Stealth. The documents included a "Stealth Brand Baseball Sales" document, consisting of a listing of yearly "sales" figures with no itemization or breakdown; a "Sales Quote Sheet" addressed to Best Products and dated January 15, 1988; a "Sales Quote Sheet" addressed to Venture Stores and dated February 11, 1991; a "Sales Quote Sheet" addressed to F.W. Woolworth and dated January 10, 1994; and a "Sales Quote Sheet" addressed to Montgomery Wards and dated December 3, 1997. These alleged records do not reflect any actual sales of any products, nor any orders for any products. In his deposition, Stoller testified that he "[didn't] know the exact quantity of sales to each [customer]" and that he didn't "know the dollar figure" of any sales. He could not remember when he allegedly sold bats, but testified that he sold approximately $10,000 worth of bats, a figure "that comes from [his] memory." (Stoller Dep., at 197-99, 211-13).

On February 23, 2005, at a document inspection, Stoller produced a printout of a spreadsheet which he claimed showed sales some of Plaintiffs' Stealth-branded products between 1988 and 2003. Stoller contends that the spreadsheet does not reflect the sales of its alleged licensees' "Stealth" products during that time period. The sales spreadsheet shows that baseball bats were not included in the list of sporting goods bearing the mark "Stealth" and purportedly sold by Plaintiffs during the period from 1988 to 2003.

**Plaintiffs' Trademark Registrations**

On August 29, 1984, Stoller, then doing business as Sentra Sporting Goods U.S.A. Co., filed Registration No. 1,332,378 ("the '378 Registration") with the United States Patent and Trademark Office (the "US PTO") for "Sporting goods, specifically, tennis rackets, golf clubs, tennis balls, basketballs, baseballs, soccer balls, golf balls, cross bows, tennis racket strings and shuttle cocks." The '378 Registration does not include baseball bats. On February 9, 2001, Plaintiff Central Manufacturing filed Registration No. 2,892,249 ("the '249 Registration") with the US PTO for "Baseball, softball, T-ball bats." The '249 Registration lists a first use date of the Stealth mark for baseball bats as January 3, 2001.

**Alleged License Agreement With Easton**

In their Amended Complaint, Plaintiffs contend that they licensed the '378 Registration to Jas. D. Easton, a wholesaler of sporting equipment, including baseball-related equipment. Plaintiffs produced what they allege is a "Stealth Trademark License Agreement" ("the Easton Agreement"), entered into by RENTAMARK.COM, as the licensor, and Jas. D. Easton, as the licensee, on June 3, 2003. Stoller contends that RENTAMARK.COM is a service mark,

Registration No. 2,371,075, owned by Central Mfg. Co.[3] Neither RENTAMARK.COM nor Jas.

D. Easton is a Plaintiff in this action. Furthermore, none of the named Plaintiffs in the instant

case were included as parties to the Easton Agreement. Stoller, however, maintains that Central

Mfg. Co., as the alleged owner of the service mark Rentamark.com, was a party to the Easton

Agreement, but has failed to produce evidence that supports his characterization of the

relationship between Central Mfg. and Rentamark.com.

Plaintiffs state that they learned of Defendants' allegedly infringing use of the Stealth

mark on baseball bats in early 2004 and brought the instant suit. Presently before this Court are

both Plaintiffs' and Defendants' motions for summary judgment.

## II.     STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories

and admissions on file, together with the affidavits, if any, show that there is no genuine issue as

to any material fact and that the moving party is entitled to a judgment as a matter of law."

FED.R.CIV.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Lucas v. Chicago*

*Transit Auth.*, 367 F.3d 714, 720 (7th Cir. 2004). A genuine issue of material fact exists for trial

when, in viewing the record and all reasonable inference drawn from it in a light most favorable

to the non-movant, a reasonable jury could return a verdict for the non-movant. *Anderson*, 477

U.S. at 248. The movant bears the burden of establishing that there is no genuine issue of

material fact remaining in dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Hedberg*

*v. Indiana Bell Tel. Co.*, 47 F.3d 928, 931 (7th Cir. 1995). If the movant meets this burden, the

---

[3] Plaintiffs included a declaration by Leo Stoller in their responsive L.R. 56.1(b) materials, to which a copy of the Rentamark.com registration was allegedly attached. No such attachment was included with the materials filed before this Court.

non-movant then must set forth specific facts that demonstrate the existence of a genuine issue for trial. FED.R.CIV.P. 56(e); *Celotex*, 477 U.S. at 324. Rule 56(c) mandates the entry of summary judgment against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. A mere scintilla of evidence in support of the non-movant's position is not sufficient to defeat a summary judgment motion. Rather, the non-movant must provide evidence that would enable a reasonable jury to find in favor of the non-movant. *Anderson*, 477 U.S. at 250.

On cross-motions for summary judgment, the traditional standards for summary judgment apply and each movant must individually satisfy the Rule 56 requirements. *Blum v. Fisher and Fisher, Attys at Law*, 961 F. Supp. 1218, 1222 (N.D. Ill. 1997). Thus the Court will consider the merits of each cross-motion separately and draw all reasonable inferences and resolve all factual uncertainties in favor of the non-movant.

Before analyzing any of the arguments, this Court must remind the parties that statements of fact are exactly what the name suggests: statements of *fact*, not argument. Throughout their Local Rule 56.1 filings of "fact," both parties engage in extensive and highly improper legal argument. Although strongly tempted to strike all the pleadings and order the parties to submit filings that accord with the rules and the local rules of this District, this Court, in its discretion, will simply disregard all the inappropriate legal arguments raised in the statements of fact. *See Malec v. Sanford*, 191 F.R.D. 581 (N.D. Ill. 2000) (setting forth clearly and concisely the pleading requirements under Rule 56 and Local Rule 56.1).

III.    ANALYSIS

A.    Defendants' Motion for Summary Judgment

Defendants move for summary judgment because they allege that Plaintiffs[4] cannot produce evidence to support their claim that they have senior user trademark rights in the world "Stealth" on baseballs or baseball bats. Even if Plaintiffs do have a trademark on "Stealth" for baseball goods, Defendants contend that Plaintiffs abandoned the mark with no intent to resume use or, if this Court does not find the mark abandoned, that there is no likelihood of confusion between Plaintiffs' usage and Defendants' products. Finally, Defendants seek cancellation of Plaintiffs' '249 Registration on the ground that Brett Bros. undisputedly had prior use of the mark "Stealth" for baseball bats.

1.    Federal Trademark Claims

In a trademark infringement action, "the plaintiff must demonstrate: (1) the validity of its trademark; and (2) the infringement of that mark." *Platinum Home Mortgage Corp. v. Platinum Fin'l Group, Inc.*, 149 F.3d 722, 726 (7th Cir. 1998).

a.    Validity of Plaintiff's Trademark

A trademark registration "is admissible into evidence to establish registrant's rights on a prima facie basis but ... an opposing party may prove any legal or equitable defense ... which might have been asserted if the mark had not been registered." *Union Carbide Corp. v. Ever-Ready, Inc.*, 531 F.2d 366, 378 (7th Cir. 1976). Defendant Brett Bros. claims that Plaintiffs do

---

[4] This Court notes that Plaintiffs provide only a conclusory statement of standing for each named Plaintiff. With respect to plaintiff Stealth Industries, Inc., standing is not clearly established. For the purposes of these summary judgment motions only, this Court will assume that the three plaintiffs have standing. This Court makes no finding as to standing at this time, however.

-10-

not own the mark "Stealth" for baseball goods because Plaintiffs cannot show actual use of the mark in connection with an established, presently existing, and ongoing business. *Zazú Designs v. L'Oréal, S.A.*, 979 F.2d 499, 503 (7th Cir. 1992) ("By insisting that firms use marks to obtain rights in them, the law prevents entrepreneurs from resreving brand names in order to make their rivals' marketing more costly.") Defendants point to Plaintiffs' unsupported assertions or unauthenticated evidence of small amounts of sales, the lack of invoices or receipts that would evidence business transactions to demonstrate that Plaintiffs do not own "Stealth" for baseball bats or baseballs. *See S Indus., Inc. v. JL Audio, Inc.*, 29 F. Supp. 2d 878, 887 (N.D. Ill. 1998). Plaintiffs, by contrast, offer a copy of an Easton Sports catalog, which it contends demonstrates that its alleged licensee was active in the baseball market. In addition, Plaintiffs provide "Sales Quote Sheets" dating from 1988, 1991, 1994, and 1997. Finally, Plaintiffs provide a baseball and an alleged advertising flyer. The law, however, is clear that "mere advertising and documentary use of a notation apart from the goods do not constitute technical trademark use." *Powermatics, Inc. v. Globe Roofing Prods. Co.*, 341 F.2d 127, 130 (C.C.P.A. 1965); *see also Avakoff v. S. Pac. Co.*, 765 F.2d 1097, 1098 (Fed. Cir. 1985). Other than testimonial evidence, Plaintiffs have failed entirely to provide admissible evidence that they offered "Stealth" baseball items in the market at any time. Plaintiffs produced a table of "Stealth Brand Baseball Sales" between 1996 and 2003, but could provide absolutely no information to justify the lump sum "sales" figures listed. There is no way for this Court to know that this alleged sales sheet bears any relation to reality and is not simply something Plaintiffs generated on a home computer for the purposes of this litigation. This spreadsheet is conclusory and, in any event, makes no attempt to itemize sales by product description or type. Without documentation to show to whom the alleged sales

-11-

were made or whether the goods involved were in fact "Stealth" brand, it is not valid evidence.

The alleged "Sales Quote Sheets" Plaintiffs claim they provided to various corporations between

1988 and 1997 are likewise inadmissible. They purport to be a list of various Stealth products

with corresponding prices. There is absolutely no evidence that these products ever existed

except as lines on a piece of promotional paper or that any of these corporations ordered even

one item from Plaintiffs. Moreover, these "Sales Quote Sheets" fail to rise above "mere

advertising of a product" and are insufficient to establish continuous use. *Avakoff*, 765 F.2d at

1098. In short, Plaintiffs have failed completely to support their claim that they actually used the

"Stealth" mark in connection with an established, presently existing, and ongoing business prior

to Brett Bros. use of the word "Stealth" on baseball bats in 1999. This Court therefore finds that

Plaintiffs do not own the mark "Stealth" for baseballs or baseball bats.

## 2.    Trademark Abandonment

Defendants allege that even if Plaintiffs once owned "Stealth" for use with baseball

related goods, they abandoned the mark after two decades of non-use with no intent to resume

use of the mark for any legitimate commercial purpose. Under the Lanham Act, a mark will be

deemed abandoned when its use is discontinued with an intent not to resume use. 15 U.S.C. §

1127. When not explicitly stated, the intent not to resume use can be inferred from the

circumstances of the case. Specifically, three consecutive years of nonuse serves as prima facie

evidence of abandonment. 15 U.S.C. § 1127. The statutory language clarifies that "'use' of a

mark means the bona fide use of such mark made in the ordinary course of trade, and not made

merely to reserve a right in a mark." *Id*. Under the Lanham Act, Plaintiffs would have to be able

to show that they did not discontinue use of the mark for three or more consecutive years.

Plaintiffs fail utterly in this regard. In fact, Plaintiffs did not produce any invoices, purchase orders, cancelled checks, bank statements, or any other indicia of a commercial transaction involving the sale of even one "Stealth" baseball-related product.[5]

At his deposition, Plaintiff Leo D. Stoller testified that he had sold baseball bats to at least three retailers[6] and had purchase orders reflecting those sales. He could not remember the quantity of bats sold, the dollar amount of the sales, or when the sales occurred, but stated that he sold about $10,000 worth of bats between 1989 and 2003. He did not produce the alleged purchase orders at any time in this litigation.[7] After his deposition, Stoller produced four "Sales Quote Sheets" which purport to show "quotes" for various "Stealth" products to Best, Venture, Woolworth, and Montgomery Ward for approximately $900 each. But as previously noted, "quotes" do not suffice as evidence of sales or "bona fide use of [a] mark made in the ordinary course of trade." 15 U.S.C. § 1127. Moreover, these quote sheets contradict Stoller's deposition

_____

[5] Plaintiffs contend that Defendants' failure to oppose Plaintiffs' prior similar registrations of the word "Stealth" for other purposes–a practice of dubious validity in itself–means that Plaintiff should prevail even if Defendants establish abandonment. Plaintiffs attempt to base this argument on *Morehouse Manufacturing Corp. v. J. Strickland & Co.*, 407 F.2d 881 (C.C.P.A. 1969). The prior registration or *Morehouse* defense is inapplicable here, as Defendants note, because it is an equitable defense "to the effect that if the opposer can not be further injured because there already exists an injurious registration, [then] the opposer can not object to an additional registration that does not add to the injury." *O-M Bread, Inc. v. U.S. Olympic Comm.*, 65 F.3d 933, 938 (Fed. Cir. 1995). Here, Plaintiffs do not seek to register a mark nor Defendants to oppose a registration. Instead, Defendants seek to demonstrate that Plaintiffs have abandoned.

[6] The retailers Stoller identified were Montgomery Wards, Venture, and Best Products, all of which have subsequently ceased operations.

[7] The failure to produce documents comes as little surprise. In his deposition testimony, Stoller recounted that when he has no set practice for handling purchase orders or invoices. Sometimes he generates them, sometimes he does not. Stoller also testified that he had no record maintenance policy. He stated that he maintained records in banker boxes in his office but did not know how many years' worth of records he had. Stoller Dep. at 174-79.

testimony. The quoted amounts only amount to $3,321.60 worth of bat sales, instead of the $10,000 claimed in Stoller's deposition. Plaintiffs' quote sheets also reflect $376.49 in baseball sales between 1988 and 2003, but the "baseball sales sheets" claim $101,489 worth of "Stealth" baseball sales in the same time period. Finally, the "baseball sales sheet" makes absolutely no mention of baseball *bat* sales. In fact, given the near total dearth of documentary evidence supporting Plaintiffs' contentions of mark usage, it is far more reasonable to find that Plaintiffs' actions amount to, at best, an attempt "merely to reserve a right in the mark" for baseless, harassing litigation such as this. This Court finds that Plaintiffs abandoned the "Stealth" mark with respect to baseballs before Defendants began to use it on baseball bats in 1999.

### 3. Likelihood of Confusion

Defendants assert that even if Plaintiffs own a "Stealth" mark for use with baseball bats, there is no likelihood of confusion between Defendants' products and Plaintiffs' products. Thus, Defendants contend that judgment should be entered in their favor.

### B. Plaintiffs' Motion for Summary Judgment

### 1. Trademark Infringement

Plaintiffs assert that because they registered the '378 Registration[8] on April 23, 1985, and re-registered it on March 18, 1993, they have priority of use of the mark "Stealth" for sporting goods, including baseballs and baseball bats. Specifically, Plaintiffs contend they are the senior user of the mark for all baseball related products. Further, Plaintiffs claim that "nine of the 33 STEALTH trademarks [Stoller] owns cover sporting goods products that closely relate to

---

[8] The '378 Registration encompasses "sporting goods, specifically, tennis rackets, golf clubs, tennis balls, basketballs, baseballs, soccer balls, golf balls, cross bows, tennis racket strings and shuttlecocks."

Defendants' use of STEALTH with baseball bats." (Pls.' Summ. J. br., at 7). Plaintiffs filed an application for a trademark on baseball bats on February 9, 2001, providing a date of first use of January 3, 2001. The US PTO granted that application as the '249 Registration, which Plaintiffs registered on October 12, 2004, well after Plaintiffs filed the instant case. The Lanham Act permits the registration of trademarks and the enforcement of registered marks. 15 U.S.C. § 1051 *et seq.* To show infringement, Plaintiffs must show that they (1) registered a trademark; (2) which Defendants used in commerce without Plaintiffs' consent; and (3) which created a likelihood of confusion as a result. *See S Indus., Inc. v. GMI Holdings, Inc.*, 1998 WL 67627, * 3 (N.D. Ill. Jan. 30, 1998).

It is undisputed that Plaintiffs acquired a registration for the use of the word "Stealth" with respect to baseballs in 1985 through the '378 Registration. It is equally clear that Plaintiffs did not acquire a registration for the use of the word "Stealth" with respect to baseball *bats* until October 2004. In addition, Plaintiffs have registered the word "Stealth" for use with a virtual cornucopia of unrelated items, including microwave absorbing automobile paint, lawn sprinklers, window locks, automotive tires, comic books, leather wallets and handbags, hunters' scent camouflage, and orthodontic devices. (Pls.' Summ. J. Br., at 1; Ex. CL1.)

This Court cannot find that Defendants' use of the word "Stealth" with respect to baseball bats violates section 1114 of the Lanham Act. 15 U.S.C. § 1114. Defendants began selling bats through their website in 1999. Plaintiffs did not register the "Stealth" mark for use on baseball bats until October 2004, after more than four years had elapsed. Thus, Defendants' use of "Stealth" on its baseball bats in 1999 could not infringe Plaintiffs' mark under § 1114.

-15-

Plaintiffs contend that baseball bats are so "closely related" to baseballs that Defendants' use of the word "Stealth" on bats infringes Plaintiffs' mark for baseballs. "Modern trademark law prohibits use of a senior user's mark not only on products that are in direct competition with those of the senior use but also on products that are considered 'closely related' to the senior user's." *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 958 (7th Cir. 1992), *cert. denied*, 507 U.S. 1042 (1993). A "closely related" product is one which could "reasonably be thought by the buying public" to come from the same source or an affiliated source with the owner of the trademark. *Id*. Plaintiffs assert that baseballs and baseball bats are closely related under this definition. The problem with Plaintiffs' argument is that it assumes that they are the senior user for baseballs. This Court finds otherwise.

In addition, Plaintiffs have provided no evidence that the public believes that the Defendants' products are manufactured by or otherwise affiliated with the Plaintiffs. The only evidence Plaintiffs offer is unsupported testimony by Leo D. Stoller, president of Central Manufacturing Co., that he has received queries from unidentified members of the public who thought Defendants' baseball products were affiliated with Plaintiffs. As with previous Stoller lawsuits, Plaintiffs provide no documentary evidence to support these assertions or even to demonstrate that such queries took place. *See S Indus., Inc. v. GMI Holdings, Inc.*, No. 96 C 2232, 1998 WL 67627, at * 4 (N.D. Ill. Jan. 30, 1998). Plaintiffs fail to produce any sworn testimony from consumers confused about the origin of Defendants' baseball products. Defendants, by contrast, produced sworn statements from several people with longstanding involvement in the sport of baseball as coaches, former players, trainers, and baseball goods

-16-

representatives, all of whom state that they had never heard of Plaintiffs or Plaintiffs' alleged products. (Nolan Decl., Hostetler Decl., Brett Decl.; Rice Decl.)

Ownership of a trademark is not based solely on registration. Goods also must be used in commerce, meaning that the mark must be affixed to goods, containers, or documents associated with the good, and when the goods are sold or transported in commerce. 15 U.S.C. § 1127. None of Plaintiffs "evidence" establishes that any goods were actually sold or transported in commerce. In fact, it is unclear whether Plaintiffs make any products. It is not clear whether the baseball featured in Plaintiffs flyer is even for sale by Plaintiffs or whether any baseballs were ever sold.

### 2.    False Designation of Origin and Unfair Competition

Plaintiffs also allege that Defendants violated Section 1125(a) of the Lanham Act by using the "Stealth" mark in false designation of their origin. 15 U.S.C. § 1125(a). Section 1125(a) sweeps more broadly than § 1114, which applies only to registered marks. Under Section 1125(a), Plaintiffs who believe that another person's use of the same mark will cause a likelihood of confusion about the origin of the good may bring a civil action against that person. 15 U.S.C. § 1125(a)(1). To prevail, Plaintiffs must show that they have (1) prior ownership rights in the mark; and (2) that Defendants' use of the mark creates a likelihood of confusion, deception or mistake. *Dunn v. Gull*, 990 F.2d 348, 351 (7th Cir. 1993).

### a.    Ownership Rights

A party acquires a protectable right in a trademark only through the use of that mark in connection with its product. *Zazú Designs v. L'Oréal S.A.*, 979 F.2d 499, 503 (7th Cir. 1992). The law insists "that firms use marks to obtain rights in them," thereby preventing "entrepreneurs" or

scam artists "from reserving brand names in order to make their rivals' marketing more costly." *Zazú Designs*, 979 F.2d at 503 (citing *Blue Bell, Inc. v. Farah Mfg. Co.*, 508 F.2d 1260, 1264-65 (5th Cir. 1975)). Plaintiffs supply a copy of the 2004/2005 Easton Sports catalog to show that they–or their licensee–used the mark in commerce. The only date on the catalog, however, is 2004-2005, which is *after* Defendants admit they began selling Stealth baseball bats. In addition, the Easton catalog is not admissible for multiple reasons, not the least of which are that there is no evidence showing that it was ever sent out to potential customers or that it ever resulted in the sales of even a single bat. Marketing and promotional materials alone are insufficient to constitute trademark use. *Powermatics, Inc.*, 341 F.2d at 130. Plaintiffs also provide an advertising flyer for a STEALTH baseball. This flyer likewise fails to support Plaintiffs' contentions. The flyer provides information on how to contact Plaintiffs for licensing opportunities but does not list sales information like price. The flyer is dated 2003, well after Defendants began selling their products. Like the Easton catalog, the flyer completely lacks any indication about how many baseballs were sold or, indeed, if any were sold at all. Although registration, coupled with slight sales, establishes an exclusive right in the mark against junior users, *S Indus., Inc. v. Space Age Technologies*, 1999 WL 495484, at *5 (N.D. Ill. June 30, 1999) (citing *Zazú Designs*, 979 F.2d at 503), Plaintiffs have provided absolutely no credible evidence of baseball product sales to establish their exclusive right in the Stealth mark for baseballs, much less for baseball bats. Thus, Plaintiffs cannot rely on their trademark registrations to establish ownership of the mark with respect to baseball related products.

At the common law, "use" means sales to members of the public of a product with the mark in question affixed or attached. *Zazú Designs*, 979 F.2d at 503. Plaintiffs provide a flyer

that purports to advertise a Stealth baseball. The flyer indicates how an interested customer could contact Plaintiffs to obtain additional information. There is nothing on the flyer to indicate how to obtain the product or where to see the entire product line (if any); rather the flyer tells consumers how they can learn about Stealth licensing opportunities if they use the contact information.  Plaintiffs claim they began selling baseball related products "since at least as early as 1981." (Pls.' Summ. J. Br., at 1.) Yet Plaintiffs provide no documentary evidence of their use of the mark in commerce at any time. Instead, they provide a list of 33 alleged Stealth federal trademark registrations and an assertion that "Plaintiffs' use of the mark STEALTH as a trade name, 'house' mark, and service mark began in 1981 and has continued until the present." (Pls.' Summ. J. Br., at 6.) In addition, they provide 51 alleged licensing or settlement agreements between one of Leo Stoller's companies and a third-party for use of the word "Stealth" on products ranging from hand tools to make prosthetic limbs to construction consulting services to track lighting. Only one of these licensing agreements deals with baseball related products; it purports to be a licensing agreement between Rentamark.com and Jas. D. Easton, Inc. for use of "Stealth" on hockey sticks, hockey shafts, hockey blades, baseball bats, and softball bats, dated May 28, 2003. In support of their motion for summary judgment, Plaintiffs fail utterly to provide any evidence of sales of baseball bats or of any other product. Minimal marketing targeted at a small audience is insufficient to "link the [] mark with [the] product in the minds of consumers" or to put other producers on notice of the mark. *Id*. Plaintiffs' flyer does not provide any information about what makes their baseball unique or why a consumer should associate it with Central Manufacturing Co. In fact, Central Manufacturing is not even mentioned on the flyer.

### 3. Likelihood of Confusion

To prevail on a claim of trademark infringement, Plaintiffs must demonstrate a likelihood, not merely a possibility of confusion. *August Storck K.G. v. Nabisco, Inc.*, 59 F.3d 616, 619 (7th Cir. 1995). The Seventh Circuit uses a seven-factor test for analyzing likelihood of confusion: (1) similarity between the marks; (2) similarity of the products; (3) the area and manner of concurrent use; (4) the degree of care likely to be exercised by consumers; (5) the strength of the plaintiff's mark; (6) actual confusion, if any; and (7) the defendant's intent to "palm-off" its product as originating from or being affiliated with plaintiff. *Rust Env't & Infrastructure, Inc. v. Teunissen*, 131 F.3d 1210, 1216 (7th Cir. 1997). No single factor is dispositive.

Plaintiffs urge this Court to grant summary judgment in their favor because the '378 Registration, which does not include baseball bats, is a "strong" mark and is sufficiently related to baseball bats to cause a likelihood of confusion. Defendants contend that Plaintiffs have produced no evidence of continuous and bona fide use of the "Stealth" mark prior to Defendants' use or any facts that support the likelihood of confusion argument. But the law does not go so far. "[A firm's] right to use [a mark] only extends as far as the goods noted in the registration." *S Indus., Inc. v. GMI, Inc.*, 1998 WL 67627, at *3 (N.D. Ill. Jan. 30, 1998) (citing *Quill Nat'l Spring Water, Ltd. v. Quill Corp.*, 1994 WL 559237, at *2 (N.D. Ill. Oct. 7, 1994). Plaintiffs allege three different types of confusion: source confusion; sponsorship confusion; and reverse confusion.[9]

---

[9] As in previous cases involving Stoller, the reverse confusion and sponsorship confusion claims appear as conclusory statements in Plaintiffs' pleadings and lack any support. They merit no discussion apart from the likelihood of confusion analysis relating to source confusion. *See S*

"Because a trademark is an identifier rather than a property 'right,' the use of a competitor's mark that does not cause confusion as to source is permissible." *Knaack Mfg Co. v. Rally Accessories, Inc.*, 955 F. Supp. 991, 999 (N.D. Ill. Mar. 3, 1997) (citing *Libman Co. v. Vining Indus., Inc.*, 69 F.3d 1360, 1362 (7th Cir. 1995)). Although likelihood of confusion is normally a question of fact, it is appropriate to dispose of it at the summary judgment stage if no reasonable fact finder could find in favor of Plaintiffs. *Door Sys., Inc. v. Pro-Line Door Sys., Inc.*, 83 F.3d 169, 173 (7th Cir. 1996); *see also S Indus., Inc. v. Stone Age Equip., Inc.*, 12 F. Supp. 2d 796, 813 (N.D. Ill. 1998).

### a. Similarity of Marks

Similarity of marks is determined by looking at similarity in sound, appearance, meaning, and connotation between the name in question and the trademark. *Knaack Mfg. Co.*, 955 F. Supp. at 1000. Here, both parties undisputedly use the mark "Stealth." Thus, sound similarity is met. With respect to appearance, Plaintiffs provided a specimen of a "Stealth" bat sold by their alleged licensee, Easton Sports; Defendants provided printouts from their website with photographs of their "Stealth" bats. Based on this evidence, the marks appear different in several ways. The Easton product features "Easton" in large capital block letters on one side of the bat and "Stealth" in large capital block letters on the other side. The words appear in white, with black and gray outlines creating a shadow or three-dimensional effect. The design conveys equally the words "Easton" and "Stealth." By contrast, the Brett Bros. bat has "Brett" printed in large font on both sides of the bat; the "B" of "Brett" has three horizontal lines along its left side, just as the "B" in the company name on the website does. The word "Stealth" appears in

---

*Indus., Inc.*, 12 F. Supp. 2d at 813 & n.28.

significantly smaller letters and a different font. The emphasis is on the word "Brett," conveying that this is a Brett Bros. bat. In addition, George Brett's signature appears directly beneath the name "Stealth," furthering differentiating the mark from the Easton product. The marks also have different connotations. Brett Bros. sells not simply its baseball bats but also its association with George Brett, a Baseball Hall of Fame member. Easton, by contrast, simply uses the mark on a number of products like any one of several other model names, including baseball, t-ball, and softball bats, shoes, pads, mitts, and gloves. Brett Bros. uses it only on bats. These factors militate against finding likelihood of confusion. *See S Indus., Inc.*, 12 F. Supp. 2d at 814.

> **b.** **Similarity of Products and Area and Manner of Concurrent Use**

Goods are related if consumers would use them in conjunction with each other. *Knaack*, 955 F. Supp. at 1000. The test for similarity of products asks "whether the products are the kind the public attributes to a single source." *Id.* (citation omitted). Courts examine competitiveness and relatedness in making this determination.

Unlike most of Plaintiffs' previous lawsuits, the products at issue in this case are competitive and related. As Plaintiffs note in their pleadings, baseballs and baseball bats are intimately related in the public mind. But closer examination reveals some key differences in the products. The Easton bat is a metal alloy, as are many of the Easton products. Defendants' bat, however, is wood. Moreover, Defendants' emphasize the fact that they make wood bats as a key factor in their success and a crucial element of their business strategy. Although the difference between a metal alloy bat and a wood bat might not be widely known to the general population, baseball players know the characteristics of each type. Furthermore, only wooden bats are used

in Major League Baseball. On balance, the similarity of products analysis favors Plaintiffs only slightly, if at all.

The Court must also consider the area and manner of concurrent use. If the products are sold in the same place and next to one another, or in the same department, then there may be a likelihood of confusion. *Packman v. Chicago Tribune Co.*, 267 F.3d 628, 646 (7th Cir. 2001). Defendants market their products directly to the consumer through their website; they also have a network of retailers in 48 states across the country who sell their products. Plaintiffs provided an excerpt from an Easton catalog, which contains no order form for direct purchase, but rather provides a list of "Easton Representatives" and their geographic sales areas. Plaintiffs produced no evidence of other sales avenues. The Defendants' website gives price information for their products; specifically, the Stealth bat retails for $49 directly from Brett Bros. There is no information about the price of Plaintiffs' products before this Court. There is almost no likelihood that a customer purchasing a bat through the Brett Bros. website would think that he or she was purchasing a bat from Easton or from Plaintiffs. *Knaack Mfg Co.*, 955 F. Supp. at 1001 ("Knaack has failed to prove that even one of its distributors carried any Rally car covers.... The clear inference from this proof is that there is no overlap in distribution, which also minimizes any possibility of confusion."). Plaintiffs provide no evidence that any retailer sells both parties' goods. Further, neither party has encountered the other in promoting and marketing their products at trade shows or through specialty publications. The evidence suggests that the parties use different venues for their marketing and publicity: Defendants attend specialty baseball trade shows and have retail relationships with sporting good and baseball supply retailers, whereas Plaintiffs simply refer in conclusory fashion to "trade shows." In sum, the

evidence before this Court shows no overlapping distribution channels or evidence of direct

competition between Plaintiffs and Defendants.

### c.       Degree of Care Exercised by Consumers

"[W]here consumers are sophisticated, deliberative buyers, confusion is less likely." *Rust*

*Env't*, 131 F.3d at 1217. There are multiple baseball bats available to consumers. Defendants are

well-known in the baseball equipment field. George Brett, as a member of the Baseball Hall of

Fame, was a highly-accomplished baseball player. Other baseball players are likely to accord his

product significant deference. Defendants' "Stealth" bat has a suggested retail price of $49,

which is sufficiently costly that consumers will exercise care in making a purchase. *See Nike,*

*Inc. v. Just Did It Enters.*, 6 F.3d 12225, 1230 (7th Cir. 1993). Plaintiffs fail to provide valid

pricing information about their bats or about the price of the allegedly-licensed Easton bats.

### d.       Strength of Plaintiffs' Mark

Plaintiffs contend that they have a "strong" mark and that this should support a finding of

likelihood of confusion. Trademark "strength" measures the likelihood that a consumer will view

a mark as identifying the source of that good. *Knaack Mfg.*, 955 F. Supp. at 1001. "Only strong

marks are entitled to protection against infringement by non-competing goods." *Telemed Corp.*

*v. Tel-Med Inc.*, 588 F.2d 213, 219 (7th Cir. 1978). A strong mark has fame, uniqueness, and

volume of usage that give it an edge in the marketplace. *Id.* Plaintiffs bear the burden of

demonstrating the strength of their mark. *Knaack*, 955 F. Supp. at 1001. Plaintiffs contend that

their mark is strong because it is arbitrary (as opposed to generic), available to be licensed on

"virtually any product," and protected by Plaintiffs' "strong policing policy." (Pls.' Summ. J.

Br., at 11.) Plaintiffs have used this argument in prior cases and courts have declined repeatedly

to find that Platiniffs' mark is strong. *See, e.g., S Indus., Inc. v. JL Audio, Inc.*, 29 F. Supp. 2d

878 (N.D. Ill. 1998); *S Indus., Inc. v. GMI Holdings, Inc.*, No. 96 C 2232, 1998 WL 67627 (N.D.

Ill. Jan. 30, 1998). In the absence of credible evidence showing the strength of Plaintiffs' mark,

this Court also finds that the mark is weak.

### e. Actual Confusion

Although proof of actual confusion is not required to demonstrate likelihood of

confusion, "courts often view evidence of actual confusion as the best evidence of actual

confusion." *JL Audio, Inc.*, 29 F. Supp. 2d at 893 (citing *Union Carbide Corp. v. Ever-Ready*

*Inc.*, 531 F.2d 366, 383 (7th Cir. 1976). *But see Nike*, 6 F.3d at 1231 (stating that "it is certainly

proper for the trial judge to infer from the absence of actual confusion that there was also no

likelihood of confusion"). "Isolated instances" of actual confusion "have been held insufficient

to sustain a finding of likelihood of confusion." *Union Carbide*, 531 F.2d at 383. Plaintiffs do

not provide evidence of any instances of actual confusion. This Court concludes that the alleged

concurrent use of the mark by the parties since at least 1999 without any incidents of actual

confusion strongly weighs against finding any likelihood of confusion. *Stone Age Equip., Inc.*,

12 F. Supp. 2d at 818.

### f. Intent to "Palm-Off"

The intent to "palm off" is defined as "trying to get sales from a competitor by making

consumers think that they are dealing with that competitor, when actually they are buying from

the passer off." *Stone Age Equip., Inc.*, 12 F. Supp. 2d at 819 (citation omitted); *see also Sands,*

*Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 959 (7th Cir. 1992). There is no evidence

that Defendants intended to "palm off" their baseball bats as those of Plaintiffs or their licensees. To suggest otherwise is patently frivolous.

The application of the seven factor test for the likelihood of confusion weighs overwhelmingly in Defendants' favor. This is, therefore, a case in which "the evidence is so one-side that there can be no doubt about how the question should be answered." *Door Sys.*, 83 F.3d at 171. Because all of Plaintiffs' Lanham Act claims require a likelihood of confusion, this Court denies summary judgment to Plaintiffs. Summary judgment is granted to Defendants on all Lanham Act claims instead.

### C.      Illinois Law Deceptive Trade Practices Claim

Claims brought under the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/1 *et seq*., are resolved in the same manner as Lanham Act claims. *D 56, Inc. v. Berry's Inc.*, 955 F. Supp. 908, 920 (N.D. Ill. 1997). To prevail, Plaintiffs would have to be able to show that they had a protectable mark and that Defendants' use thereof was likely to cause confusion. *Thompson v. Spring-Green Lawn Care Corp.*, 466 N.E.2d 1004, 1010 (Ill. App. Ct. 1984). For the reasons stated above, this Court denies summary judgment to Plaintiffs on Count III and grants summary judgment to Defendants.

### D.      Defendants Entitled to Attorneys' Fees and Costs

Under both the Lanham Act and the Illinois Consumer Fraud and Deceptive Business Practice Act, the court may award attorneys' fees to "prevailing parties." *See* 15 U.S.C. § 1117(a); 815 ILCS 505/10a(c); *see also Tri-G, Inc. v. Burke, Bosselman and Weaver*, 817 N.E.2d 1230, 1256-57 (Ill. 2004). Under the Lanham Act, the case must be "exceptional," while Illinois courts and the Seventh Circuit have construed the Illinois Consumer Act to allow fees when

"special circumstances" exist. *See Door Sys., Inc. v. Pro-Line Door Sys.*, 126 F.3d 1028, 1030-32 (7th Cir. 1997). Under *Door Systems*, a prevailing defendant must show that plaintiff's suit was "oppressive," meaning that it had elements of abuse of process. *Id*. at 1031-32. As an example, the *Door Systems* court stated that "a suit can be oppressive because of lack of merit and cost of defending even though the plaintiff honestly though mistakenly believes that he has a good case and is not trying merely to extract a settlement based on the suit's nuisance value." *Id*. at 1032 (citations omitted). The standard is "malicious, fradulent, deliberate or willful conduct." *Id.* at 1031 (internal quotations and citations omitted). Here, Plaintiffs' conduct clearly rises to the level of "oppressive." Plaintiffs offered irrelevant, questionable, and seemingly fantastical documents; inconsistent, uncorroborated, or arguably false testimony from Leo Stoller; and a cascade of so-called license or settlement agreements for unrelated products and unrelated marks. In fact, Plaintiffs failed to produce evidence that Plaintiffs or any of their related companies made a single Stealth baseball bat at any time. Further, the enormous range in license fees listed in the alleged license agreements (from $10 to $25,000) strongly suggests what several courts in this district have suspected: that Plaintiffs engage in a pattern and practice of harassing legitimate actors for the purpose of extracting a settlement amount. The judicial system is not to be used as a aid in such deliberate, malicious, and fradulent conduct.

In addition, Plaintiffs brought the instant suit before they acquired a federal trademark registration for baseball bats. In what can be at best described as artless and more likely as deliberately obfuscatory tactics, Plaintiffs repeatedly attempted to misdirect the court to federal marks or registrations not at issue in this case and so-called license agreements totally unrelated to Defendants' products. Quantity of filings in cases before this Court rarely equate to quality; it

is far more common that the reverse is true. Leo Stoller and his companies present paradigmatic examples of litigants in the business of bringing oppressive litigation designed to extract settlement. As such, this Court awards Defendants' attorneys' fees and defense costs under both the Lanham Act and the Illinois Consumer Fraud and Deceptive Business Practices Act.

### E.    Cancellation of Plaintiffs' '249 Trademark Registration

Courts have the authority to order the cancellation of a trademark registration when warranted pursuant to Section 37 of the Lanham Act. 15 U.S.C. § 1119 ("In any action involving a registered mark the court may ... order the cancelation (*sic*) of registrations...."). The net effect of Section 37 is to give federal courts concurrent power with the U.S. PTO to conduct cancellation proceedings. 5 MCCARTHY ON TRADEMARKS & UNFAIR COMPETITION § 30:109 (4th ed. 2005) (collecting cases). The court may cancel a trademark in an action where the mark's validity is placed in issue. *See Dymo Indus., Inc. v. Tapeprinter, Inc.*, 326 F.2d 141 (9th Cir. 1964). Although parties are encouraged to act quickly to protect their valid rights, courts have permitted defendants in trademark infringement suits to seek cancellation despite their failure first to petition the U.S. PTO to cancel. *See, e.g., Informix Software, Inc. v. Oracle Corp.*, 927 F. Supp. 1283 (N.D. Cal. 1996).

Defendants argue that the '249 registration is ripe for cancellation because it is less than five years old, 15 U.S.C. § 1064(1), and because it "[c]onsists of or comprises a mark which so resembles ... a mark or trade name previously used in the United States by another and not abandoned, as to be likely, when used on or in connection with the goods of the applicant, to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1052(d). Here, it is undisputed that Brett Bros. has been using "Stealth" on its baseball bats for approximately six years, which

predates any claimed use by Stoller or his predecessor-in-interest by two years. In addition, the

'249 Registration claims "baseball, softball, and t-ball bats," which are identical to the goods

Brett Bros. manufactures and sells under the mark. Plaintiffs, predictably, disagree vehemently

with Defendants. In support of their registration, Plaintiffs raise the *Morehouse* equitable defense

and argue, in disjointed fashion, that Defendants acquiesced to the '249 Registration by not

opposing it before the U.S. PTO. But this misstates the law. *See Informix*, 927 F. Supp. 1283.

Defendants' failure to oppose Plaintiffs' application for registration of "Stealth" mark for

baseball bats does not preclude Defendants' from petitioning for cancellation of the '249

Registration. *See Keebler Co. v. Rovira Biscuit Corp.*, 624 F.2d 366 (1ˢᵗ Cir. 1980). This Court

finds that Defendants have demonstrated sufficient likelihood of confusion to justify cancelling

the '249 Registration.

**Conclusion**

For the foregoing reasons, this Court DENIES Plaintiffs' motion for summary judgment in its entirety and GRANTS Defendants' motion for summary judgment. Defendants are ordered to submit a petition for attorneys' fees and a bill of costs by October 31, 2005. Defendants' request that this Court cancel Plaintiffs' Trademark Registration No. 2,892,249 is GRANTED. The Clerk shall certify this order to the Commissioner for entry upon the records of the United States Patent and Trademark Office. All other pending motions are moot and hereby terminated. This case is closed.

Enter:

/s/ David H. Coar

_____
David H. Coar
United States District Judge

Dated: **September 30, 2005**

**Appendix I**
**Northern District of Illinois Cases Involving Leo Stoller and the "Stealth" Mark**

| Case Number | Case Name | Subject Matter |
|---|---|---|
| 88-C-3722 | Slazengers Ltd. v. Stoller et al. | Trademark Infringement |
| 88-C-7215 | Skierkewiecz, et al. v. Gonzalez, et al. | Non-Trademark Infringement |
| 92-C-5622 | Stoller v. Carbaugh et al. | Trademark Infringement |
| 95-C-1634 | Stealth Indus. Inc. v. Victor Stanzel Co., et al. | Trademark Infringement |
| 95-C-2650 | Stealth Indus. Inc. v. Grace Childrens Prods. et al. | Trademark Infringement |
| 95-C-2651 | Stealth Indus. Inc. v. Zebco Inc., et al. | Trademark Infringement |
| 95-C-4509 | Stealth Indus. Inc. v. All Amer. Prod. Inc., et al. | Trademark Infringement |
| 95-C-5788 | Stealth Indus. Inc. v. Oceanic USA | Trademark Infringement |
| 96-C-1035 | S Indus. Inc. v. Amer Soccer Co., Inc. | Trademark Infringement |
| 96-C-1138 | S Indus. Inc. v. Netti Export Corp., et al. | Trademark Infringement |
| 96-C-1218 | S Indus. Inc. v. Bard Wyers Sports, et al. | Trademark Infringement |
| 96-C-1264 | S Indus. Inc. v. HHA Sports, et al. | Trademark Infringement |
| 96-C-1325 | S Indus. Inc. v. ERO Indus. Inc., et al. | Trademark Infringement |
| 96-C-1776 | S Indus. Inc. v. Fit Bearings, et al. | Trademark Infringement |
| 96-C-2037 | S Indus. Inc. v. World of Weapons, et al. | Trademark Infringement |
| 96-C-2038 | S Indus. Inc. v. Pelican Pro Inc., et al. | Trademark Infringement |
| 96-C-2166 | S Indus. Inc. v. Wonderwand, et al. | Trademark Infringement |
| 96-C-2231 | S Indus. Inc. v. Lane, et al. | Trademark Infringement |
| 96-C-2232 | S Indus. Inc. v. GMI Prof. Access Syst., et al. | Trademark Infringement |
| 96-C-3389 | S Indus. Inc. v. Diamond Multimedia, et al. | Trademark Infringement |
| 96-C-3524 | S Indus. Inc. v. Centra 2000 Inc., et al. | Trademark Infringement |

| Case Number | Case Name | Subject Matter |
|---|---|---|
| 96-C-3525 | S Indus. Inc. v. NAAN Irrigation Syst., et al. | Trademark Infringement |
| 96-C-3592 | S Indus. Inc. v. Nat'l Baseball Hall of Fame | Trademark Infringement |
| 96-C-3593 | S Indus. Inc. v. Funline Mdse Co., Inc., et al. | Trademark Infringement |
| 96-C-3916 | S Indus. Inc. v. Kimberly-Clark Corp., et al. | Trademark Infringement |
| 96-C-4140 | S Indus. Inc. v. Ecolab Inc. | Trademark Infringement |
| 96-C-4141 | S Indus. Inc. v. Tru-Fit Mkg. Corp. | Trademark Infringement |
| 96-C-4149 | S Indus. Inc. v. Mitsushiba Int'l Inc., et al. | Trademark Infringement |
| 96-C-4434 | S Indus. Inc. v. Brodix Inc., et al. | Trademark Infringement |
| 96-C-4659 | S Indus. Inc. v. JL Audio Inc., et al. | Trademark Infringement |
| 96-C-4951 | S Indus. Inc. v. Stone Age Equip. Inc., et al. | Trademark Infringement |
| 96-C-6047 | S Indus. Inc. v. Tournament Grade, et al. | Trademark Infringement |
| 96-C-6507 | S Indus. Inc. v. Photostealth Fabric | Trademark Infringement |
| 96-C-6509 | S Indus. Inc. v. Hobbico Inc., et al. | Trademark Infringement |
| 96-C-6538 | S Indus. Inc. v. E-Force Sports, et al. | Trademark Infringement |
| 97-C-1817 | S Indus. Inc. v. Hobbico Inc., et al. | Trademark Infringement |
| 97-C-2787 | S Indus. Inc. v. Space-Age Tech, et al. | Trademark Infringement |
| 97-C-3702 | S Indus. Inc. v. Sunshine Golf | Trademark Infringement |
| 97-C-3703 | S Indus. Inc. v. Tour Advanced Int'l | Trademark Infringement |
| 97-C-3704 | S Indus. Inc. v. NGA Disc Golf | Trademark Infringement |
| 97-C-3705 | S Indus. Inc. v. S E Golf | Trademark Infringement |
| 97-C-3706 | S Indus. Inc. v. Proclub Golfing Co. | Trademark Infringement |
| 97-C-3707 | S Indus. Inc. v. M & M Golf Inc. | Trademark Infringement |
| 99-C-1401 | Hartford Ins. Co. v. Diamond Computer, et al. | Non-Trademark Infringement |

| 00-C-6586 | Stealth Indus. Inc. v. Stealth Sec. Syst., Inc., et al. | Trademark Infringement |
|---|---|---|
| **Case Number** | **Case Name** | **Subject Matter** |
| 00-C-7867 | Centra Software Inc. v. Stoller, et al. | Trademark Infringement |
| 04-C-3049 | Stealth Indus. Inc. v. George Brett & Brett Bros. Sports Int'l, Inc. | Trademark Infringement |
| 05-C-725 | Central Mfg. Co., et al. v. Pure Fishing, Inc., et al. | Trademark Infringement |
| 05-C-2052 | Columbia Pictures Indus., Inc. v. Stoller et al. | Trademark Infringement |

**Total Number of Cases:    49**