04 C 3049

FILED
JUL 31, 2007

CERTIFIED COPY JUL 3 1 2007

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

In the

# United States Court of Appeals
## For the Seventh Circuit

No. 06-2083

CENTRAL MANUFACTURING, INCORPORATED,
a Delaware corporation, doing business as
Central Manufacturing Company and Central
Manufacturing Company of Illinois, and
STEALTH INDUSTRIES, INCORPORATED,

*Plaintiffs-Appellants,*

*v.*

GEORGE BRETT and BRETT BROTHERS SPORTS
INTERNATIONAL, INCORPORATED,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 C 3049—David H. Coar, *Judge.*

ARGUED MAY 2, 2007—DECIDED JULY 9, 2007

Before EVANS, WILLIAMS, and SYKES, *Circuit Judges.*

EVANS, *Circuit Judge.*

### The Pine Tar Incident

It's undisputed: George Brett was a great baseball
player. The statistics from his 21 years in The Show, all
with the Kansas City Royals, seal the deal: 3,154 hits, 317

home runs, and a career batting average of .305. Only three other players—Stan Musial, Hank Aaron, and Willie Mays—ended their careers with more than 3,000 hits and 300 home runs, while still maintaining a lifetime batting average over .300. Brett's selection to the Hall of Fame, on the first ballot in 1999, was richly deserved. Yet for all his accomplishments, many who love baseball will always think of the "Pine Tar Incident" as the capstone of his career. It is a joy to recall.

It was July 24, 1983, and the Royals, trailing 4-3 to the New York Yankees, had a man on first but were down to their final out in the top half of the ninth inning. Brett was at the plate. The Yankees' ace closer, "Goose" Gossage, was on the mound. And Brett crushed an 0-1 fastball over the 353-foot mark into the right field seats, giving Kansas City the lead, 5-4. Pandemonium broke out in the Royals' dugout. The Yankee Stadium crowd fell silent. But things were about to change.

While the Royals were celebrating, the Yankees' fiery manager, Billy Martin, walked calmly (unusual for him) to home plate where he engaged the umpire, Tim McClelland, in quiet conversation. Martin pointed to an obscure rule (and we sometimes think the Federal Rules of Appellate Procedure are obscure!), which provides that any substance (including pine tar) that a player might rub on his bat handle for a better grip cannot extend more than 18 inches. *See* Major League Baseball Official Rules § 1.10(b). Martin, pointing to a lot of pine tar on the bat Brett left behind as he circled the bases, asked McClelland to check it out. McClelland, using home plate as a ruler, determined that pine tar covered 24 inches of the bat handle. So the bat, McClelland ruled, was illegal.

With his ruling ready for delivery, McClelland took a few steps toward the jubilant Royals' dugout and gave the signal: for using an illegal bat, the home run was

nullified, and Brett was out. Game over. Yankees win 4-3. And all hell broke loose. An infuriated George Brett charged out of the dugout and rushed McClelland as Martin, who looked like the cat who ate the canary, stood off to the side. It was one of the great all-time rhubarbs in baseball history. And that's how it ended, at least for July 24, 1983.

But baseball, like our legal system, has appellate review. The Royals protested the game and, as luck would have it, American League President Lee MacPhail (to use a phrase with which we are accustomed) "reversed and remanded for further proceedings." The game resumed three weeks later with Kansas City ahead, 5-4. It ended after 12 minutes when Royals' closer Dan Quisenberry shut the door on the Yankees in their half of the ninth to seal the win. The whole colorful episode is preserved, in all its glory, on YouTube, at http://www.youtube.com/watch?v=4Cu1WXyIkto (last visited June 6, 2007). *See also* Retrosheet Boxscore, Kansas City Royals 5, New York Yankees 4, at http://www.retrosheet.org/boxesetc/1983/B07240NYA1983.htm (last visited June 6, 2007).

## Our Case Today

And so, at last, we come to this case which presents another (albeit a less compelling) appeal of a dispute involving George Brett and a baseball bat. We begin with the facts.

In 2001, Brett joined Tridiamond Sports, Inc., a manufacturer of baseballs, baseball bats, gloves, and other related accessories, to form Brett Brothers Sports International, Inc. (Brett Brothers). Tridiamond was incorporated in 1997 by Joe Sample, a former airline executive who had served as vice-president and president of International Ambassador, a company specializing in the

organization of travel programs. International Ambassador was purchased in 1996 by former Major League Baseball Commissioner Peter Ueberroth, and informal conversations with Ueberroth soon gave Sample an idea. Ueberroth mentioned the difficulty some players had in adjusting from the use of metal baseball bats at the high school and collegiate levels to the wood bats of professional baseball. Initially introduced in the early 1970s as a cost-saving alternative for leagues operating under a smaller budget due to the breakability of wood bats, metal bats were eventually believed to generally outperform wood ones, Joseph J. Crisco *et al.*, *Batting Performance of Wood and Metal Baseball Bats*, 34 Med. & Sci. in Sports & Exercise 1675, 1675 (2002), a consensus more or less confirmed by scientific studies, *see, e.g., id.* at 1683; Fred O. Bryant *et al.*, *Dynamic and Performance Characteristics of Baseball Bats*, 48 Research Quarterly 505 (1977).[1] Because the use of metal bats may inflate hitting statistics, a player's professional prospects may be misevaluated, and the shift to wood bats may reveal a great player to be merely a very good one—the difference, potentially, between a highly compensated major league career and a decade spent on buses shuttling from Appleton to the Quad Cities.

Sample realized that the uncertainty of the switch potentially created a market niche for a bat that combined the best of both worlds: the production and feel of the wood bat with the break-resistance of the metal bat. He thus formed Tridiamond and initiated research on the construction of a more durable wood bat. Eventually the

---

[1] This consensus has played a role in the recent movement against the use of metal bats in youth and high school baseball, which is motivated by the concern that the use of metal bats might increase the risk of serious or even fatal injury for a player hit by a batted ball. Jim Ritter, *Aluminum Bat Backlash*, Chi. Sun-Times, May 10, 2007, at 6.

company developed a specialized process of grading, lamination, and fiberglass reinforcement that enabled the product they were looking for. Tridiamond initially sold three bat models with names inspired by Sample's background in aviation: the Mirador, the Stealth, and the Bomber.

Brett Brothers now sells eight different models of wood bats used throughout all levels of amateur and professional baseball. Relevant for our purposes is the Stealth model, which the Brett Brothers' Web site describes as follows:

> The stealth bats are constructed of laminates from hand selected and graded hardwoods. The patented "Boa" reinforcement on the handle significantly enhances durability. The choice of wood for the barrel has proven to greatly reduce the chipping and flaking characteristic in one-piece ash bats.
>
> This model has NCAA approval for all levels of play and is also BESR Certified.
>
> The Stealth bat is available in 31", 32", 33", and 34" lengths with weight drops up to -3 ounce.

*Brett Bros. Sports International, Inc.—The Very Best in Baseball—Bats*, at http://shopsite.brettbats.com/shopbats.html (last visited June 6, 2007). The first recorded sale of the Stealth bat occurred on July 13, 1999, when twelve bats were sold to Tim Nolan of Pro-Cut in Rockford, Illinois. Brett Brothers has since sold more than 25,000 Stealth bats to all manner of customers worldwide, including through retail outlets in 48 states and via its Web site.

The plaintiffs in this action, Central Manufacturing, Inc. and Stealth Industries (collectively "Central"), are both controlled by Leo Stoller, who serves as president and sole shareholder. Stoller similarly operates a number of

other companies, including Rentamark.com, S Industries, Inc., and Sentra Manufacturing. Stoller alleges that his companies have been using the "Stealth" trade name and mark for a wide range of products since at least 1982. Indeed, Stoller has registered the Stealth mark for things like boats, motorcycles, bicycles, microwave-absorbing automobile paint, billiard and dart equipment, auto locks, window locks, comic books, lawn sprinklers, metal alloys, pest elimination devices, and other products. *S Industries, Inc. v. Ecolab, Inc.*, 1999 WL 162785, at *1 (N.D. Ill.). In 1984, Stoller, through Sentra Manufacturing, filed a trademark registration with the United States Patent and Trademark Office (PTO) claiming ownership of the Stealth mark for "[s]porting goods, specifically, tennis rackets, golf clubs, tennis balls, basketballs, baseballs, soccer balls, golf balls, cross bows, tennis racket strings and shuttle cocks." Sentra was awarded the mark in 1985; it was eventually transferred to Central in 1997.

In 2001, Central filed a mark application with the PTO for using the Stealth word mark on "baseball bats, softball bats and t-ball bats." Later that year, Central entered into a licensing agreement with Blackwrap, Inc. for the use of the Stealth word mark on its bats; a similar agreement was reached (for $800) with Easton Sports, Inc. in 2003. In 2004 (five years after the first Brett Brothers sale of Stealth-model bats), the U.S. PTO granted the mark for baseball bats. Central soon became aware of Brett Brothers' use of the Stealth word mark and filed suit in the Northern District of Illinois, alleging violations of the Lanham Act, 15 U.S.C. § 1051 *et seq.*, and the Illinois Deceptive Trade Practices Act, 815 ILCS 510/1 *et seq.* Central believes that because they registered the "Stealth" mark for baseballs and other sporting goods in 1985, they have priority of use of the mark for baseball bats, and Brett Brothers is guilty of infringement and unfair competition. *See* 15 U.S.C. §§ 1114, 1125(a). (The inquiry under

Illinois law mirrors the federal. *See James Burrough Ltd. v. Sign of Beefeater, Inc.*, 540 F.2d 266, 274 (7th Cir. 1976)).

Leo Stoller is no stranger to trademark litigation. Indeed, one might say it is the essential part of his business strategy. In fact, were there a Hall of Fame for hyperactive trademark litigators, Stoller would be in it. And, like George Brett, he would have gotten in on the first ballot. Acting as a sort of intellectual property entrepreneur, Stoller scores has federally registered scores of trademarks with the U.S. PTO (Central lists upwards of 50 that are actual or pending for just the "Stealth" mark), many containing everyday words that regularly pop up in commercial enterprise. When other companies or individuals inevitably make use of these words, Stoller issues cease-and-desist letters in the hopes that the user will blanche at the prospect of litigation and either agree to pay him a "licensing fee" or yield to his claims of ownership and stop using the alleged mark altogether. "Essentially, if an entity markets a product with some version of the name 'Stealth' or otherwise with a 'stealth'-like description, Plaintiff has elected to sue that entity." *S Industries, Inc. v. JL Audio, Inc.*, 29 F. Supp. 2d 878, 881 (N.D. Ill. 1998).

In a small handful of cases this has paid off. The electronics makers JVC and Panasonic and the retailer Kmart, for example, have each removed the word "stealth" from their respective Web sites after receiving letters from Stoller or one of his companies. Northrop Grumman, the maker of the famed stealth bomber fighter plane, even agreed to pay Stoller $10 and refrain from using the term on any spinoff products. *See generally*, Colin Moynihan, *He Says He Owns the Word "Stealth" (Actually, He Claims "Chutzpah," Too)*, N.Y. Times, July 4, 2005, at C5.

More often, however, Stoller has resorted to litigation in the face of "noncompliance"—usually without success. *See*,

e.g., *S Industries, Inc. v. Ecolab, Inc.*, 1999 WL 162785
(N.D. Ill.) (rejecting claim that Ecolab infringed the
"Stealth" mark in conjunction with certain pest elimination
products); *S Industries, Inc. v. JL Audio, Inc.*, 29 F. Supp.
2d at 888 ("At a minimum, Plaintiff has failed to estab-
lish . . . that it has conducted sufficient use of any kind but
particularly use as to audio products to justify the validity
of its trademark."); *S Industries, Inc. v. Stone Age Equip.,
Inc.*, 12 F. Supp. 2d 796, 820 (N.D. Ill. 1998) (declining to
find trademark infringement against athletic shoe manu-
facturer because of SI's failure to produce evidence it ever
used such a mark); *S Industries, Inc. v. Centra 2000, Inc.*,
1998 WL 157067 (N.D. Ill.); *S Industries, Inc. v. Diamond
Multimedia Sys., Inc.*, 991 F. Supp. 1012 (N.D. Ill. 1998);
*S Industries, Inc. v. Hobbico, Inc.*, 940 F. Supp. 210 (N.D.
Ill. 1996). In fact, Stoller's cases have generally proven so
frivolous and wasteful of court resources that since this
appeal was filed the Northern District of Illinois has
enjoined him or any of his companies from filing any new
civil action in the district's courts without first obtaining
the court's permission. *See* Executive Committee Order, *In
re Leo Stoller*, No. 07 C 1435 (N.D. Ill. Mar. 8, 2007).

A similar sequence of events unfolded here. Upon
learning of Brett Brothers' Stealth bat, Stoller sent the
company a cease-and-desist letter claiming ownership of
the "Stealth" mark for use on baseball bats, alleging
infringement, and demanding a $100,000 licensing fee.
Brett Brothers refused, and Stoller (through Central)
instituted this litigation.

An action for trademark infringement can only succeed
if, among other things, the plaintiff owns the mark.
Registration provides prima facie evidence of ownership,
but this can be rebutted by competent evidence. *See* 15
U.S.C. § 1115(a). Ultimately, it is not the fact of registra-
tion that matters so much as the use of the mark in

commerce; "[b]y insisting that firms use marks to obtain rights in them, the law prevents entrepreneurs from reserving brand names in order to make their rivals' marketing more costly." *Zazu Designs v. L'Oreal, S.A.*, 979 F.2d 499, 503 (7th Cir. 1992). Established use by a nonregistrant is a valid defense to a registrant's infringement claim. 15 U.S.C. § 1115(b)(5).

With this in mind, the district court judge (the Honorable David H. Coar) had no trouble concluding that Brett Brothers' established use of the "Stealth" mark on baseball bats since 1999 precluded any infringement on the basis of Central's 2004 registration (thus also destroying the probative value, if any, of Central's 2003 and 2004 licensing agreements with Blackwrap and Easton). Central relies instead on the theory that its 1985 registration of the "Stealth" mark for baseballs and other sporting goods gave it rights to the mark on baseball bats as "closely related" products. *See Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 958 (7th Cir. 1992), *cert. denied*, 507 U.S. 1042 (1993). Rather than address the relationship between bats and balls, Brett Brothers challenged the validity of the 1985 trademark in the first place and sought to introduce evidence establishing that Central and its predecessors never used the mark in commerce.

As part of this effort, Brett Brothers requested that Stoller produce any documents related to the development, commercial use, and sales volume of any goods bearing the "Stealth" mark. Receiving no answer, they moved to compel compliance. Judge Coar granted the motion and gave Stoller three weeks to respond. Stoller missed the deadline, and his eventual response made only vague promises of documents to come. Finally, at his deposition, Stoller produced a single softball bearing the "Stealth" mark and an advertising flyer with a picture of a similar ball. He testified that he had at various points sold baseball bats to Walmart, Kmart, Montgomery Ward,

Venture, Sears, Sportmart, Brown's Sporting Goods, and Zaire's, among others. He insisted that he had some invoices and purchase orders related to these sales, but he could not specify where these were or to which customers they corresponded. (Stoller never followed through on promises to produce these documents.) Asked for a sales total of Stealth bats, Stoller offered the number $10,000 from "memory" but could not confirm possession of records to support that figure. He also could not name the bat manufacturer.

Stoller eventually produced several documents. First was a sheet titled "Stealth Brand Baseball Sales" (not "Baseball Bat Sales") that simply provided a dollar amount for each year from 1996 to 2003. It offered nothing about any specific transactions—nothing about quantity, particular products, names of buyers, or dates of sale. Next were four similar looking "Sales Quote Sheets"—effectively price lists for four different alleged customers, all of whom are now out of business. One was addressed to Best Products in 1988, another to Venture Stores in 1991, a third to F.W. Woolworth in 1994, and one more to Montgomery Ward in 1997. Despite the apparent three-year interval between each document, the prices varied little. The aluminum bats were listed at $102 per bat in 1988, $103 in 1991, $104 in 1994, and $105 in 1997. Other products were also priced with small changes of identical increment. None of the quote sheets evidenced any actual orders or sales of the listed products. Finally, Stoller produced a spreadsheet listing itemized annual sales of a wide array of "Stealth" sports-related products. Though it lists baseballs, no baseball bats are referenced anywhere.

Judge Coar rejected this evidence in an analysis that warrants repeating:

Plaintiffs produced a table of "Stealth Brand Baseball Sales" between 1996 and 2003, but could provide

No. 06-2083                                                    11

absolutely no information to justify the lump sum
"sales" figures listed. There is no way for this Court to
know that this alleged sales sheet bears any relation
to reality and is not simply something Plaintiffs
generated on a home computer for the purposes of this
litigation. This spreadsheet is conclusory and, in any
event, makes no attempt to itemize sales by product
description or type. Without documentation to show to
whom the alleged sales were made or whether the
goods involved were in fact "Stealth" brand, it is not
valid evidence. The alleged "Sales Quote Sheets"
Plaintiffs claim they provided to various corporations
between 1988 and 1997 are likewise inadmissible.
They purport to be a list of various Stealth products
with corresponding prices. There is absolutely no
evidence that these products ever existed except as
lines on a piece of promotional paper or that any of
these corporations ordered even one item from Plain-
tiffs. Moreover, these "Sales Quote Sheets" fail to rise
above "mere advertising of a product" and are insuffi-
cient to establish continuous use. In short, Plaintiffs
have failed completely to support their claim that
they actually used the "Stealth" mark in connection
with an established, presently existing, and ongoing
business prior to Brett Bros. use of the word "Stealth"
on baseball bats in 1999.

(Citation omitted.)

We agree. As the Lanham Act defines in relevant part:

The word "commerce" means all commerce which may
lawfully be regulated by Congress.

        . . . .

The term "use in commerce" means *the bona fide use* of
a mark in the ordinary course of trade, and not made
merely to reserve a right in a mark. For purposes of

> this Act, a mark shall be deemed to be in use in
> commerce—
>
> > (1) on goods when—
> >
> > . . . .
> >
> > > (B) the goods are sold or transported *in com-
> > > merce* . . . .

15 U.S.C. § 1127 (emphasis added). Even if the sufficiency
of Central's use were not a question of fact warranting
deferential treatment on appellate review, *see Zazu
Designs*, 979 F.2d at 505, it would not be a close
question: there is absolutely nothing in the record upon
which any reasonable person could conclude that Central
and its predecessors actually sold "Stealth" baseballs
prior to Brett Brothers' first use of the mark in 1999.
Stoller has repeatedly sought ways to get around trade-
mark law's prohibition on the stockpiling of unused marks,
and this case is no different. It is unfathomable that a
company claiming to have engaged in thousands of dollars
of sales of a product for more than a decade would be
unable to produce even a single purchase order or invoice
as proof. Self-serving deposition testimony is not enough to
defeat a motion for summary judgment. By exposing
Central's failure to make bona fide use of the "Stealth"
mark for baseballs, Brett Brothers met its burden to
overcome the presumption afforded by the 1985 registra-
tion, and summary judgment in its favor was the ap-
propriate course.

Judge Coar went further. Invoking the authority granted
by 15 U.S.C. § 1119, he ordered the cancellation of Cen-
tral's 2005 registration of the "Stealth" mark for baseball
bats. We find no error in this decision, which we review
for abuse of discretion. Brett Brothers could have as-
serted its rights earlier by petitioning the PTO for cancel-
lation, *see id.* § 1064, but nothing in § 1119 requires such

a step. Instead, the provision arms courts with the power to effectively put the public on notice of its trademark-related judgments. Because a court's decision may raise doubts about the validity of a trademark registration, § 1119 arms the court with the power to update the federal trademark register to account for a mark's actual legal status (or lack thereof) after it has been adjudicated, thereby reducing the potential for future uncertainty over the rights in a particular mark. Where, as here, a registrant's asserted rights to a mark are shown to be invalid, cancellation is not merely appropriate, it is the best course.

Finally, we consider the award to Brett Brothers of attorney fees and defense costs under 15 U.S.C. § 1117, which permits the court to award fees to the prevailing party "in exceptional circumstances." We review a grant of attorney fees to a prevailing party defendant under the Lanham Act only for clear error. *Door Systems, Inc. v. Pro-Line Door Systems, Inc.*, 126 F.3d 1028, 1031 (7th Cir. 1997). And we will not reverse a determination for clear error unless it "strike[s] us as wrong with the force of a 5-week-old, unrefrigerated dead fish." *Parts and Elec. Motors, Inc. v. Sterling Elec., Inc.*, 866 F.2d 228, 233 (7th Cir. 1988) (Bauer, C.J.).

The question (notwithstanding Central's completely unsubstantiated allegation that the award was motivated by judicial bias) is whether Central's actions in bringing this lawsuit were "oppressive." *Door Systems*, 126 F.3d at 1032. And for the answer to that question, citing another Leo Stoller case, we evaluate whether the case "lacked merit, had elements of an abuse of process claim, and [whether] plaintiff's conduct unreasonably increased the cost of defending against the suit." *S Industries, Inc. v. Centra 2000, Inc.*, 249 F.3d 625, 627 (7th Cir. 2001).

Central's actions qualify on all counts! It filed an infringement lawsuit without evidence of any sales of

baseballs or baseball bats to support its claim to rights
in the "Stealth" mark for such products. It ignored re-
quests to produce documents to support its claim, forcing
the defendants' lawyers to go to court to compel action.
Stoller offered confused, misleading deposition testimony
with unfulfilled promises of cooperation. And the docu-
ments eventually produced effectively made a mockery of
the entire proceeding. We have no trouble upholding the
award of fees and costs.

The judgment of the district court is AFFIRMED.

A true Copy:

    Teste:

                                *Clerk of the United States Court of*
                                  *Appeals for the Seventh Circuit*

USCA-02-C-0072—7-9-07